George H.Wilcox, Frances C.Wilcox v. Commissioner. Hugh E.Kennedy and Naomi Kennedy v. Commissioner.
Wilcox v. Commissioner
Docket No. 3736-66, 4817-66.
United States Tax Court
T.C. Memo 1968-141; 1968 Tax Ct. Memo LEXIS 157; 27 T.C.M. (CCH) 695; T.C.M. (RIA) 68141; July 3, 1968. Filed *157 C.W. Franklin and Eugene L. Rogers, Jr., 1025 9th, Sacramento, Calif. , for the petitioners in Docket No. 3736-66. David E.Russell, 3815 Marconi Ave., Sacramento, Calif., for the petitioners in Docket No. 4817-66. Joel A. Sharon, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: In these consolidated cases respondent determined the following income tax deficiencies: Petitioners
Docket No.
Year
Deficiency
George H. and Frances C. Wilcox
3736-66
1964
$2,137.11
Hugh E. and Naomi Kennedy
4817-66
1963
2,658.86
1964
1,675.73
In Docket No. 4817-66 the parties have made certain concessions which can be given effect in the Rule 50 computation. The controversy in these proceedings arises out of the purchase by Hugh Kennedy of Frances Wilcox's one-half partnership interest in the Sierra View Funeral Chapel. The parties reported the transaction inconsistently on their Federal income tax returns. Frances Wilcox claimed the $125.000 purchase price, stated in the Agreement for Dissolution of Partnership, as proceeds received from the sale of a capital asset. Hugh Kennedy unilaterally allocated $60,000 to *158 the covenant not to compete contained in the agreement and claimed a portion thereof as a deduction for the amortization of its cost. Respondent is seeking the proper tax treatment of the respective petitioners consistent with the facts pertaining to the transaction. Thus, the key question is whether the parties, at the time they signed their agreement, intended to allocate any portion of the purchase price to the covenant not to compete and, if so, how much. Findings of Fact Some of the facts have been stipulated by the parties. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference and adopted as part of our findings. George H. and Frances C. Wilcox, husband and wife, resided in Waterville, Washington, at the time they filed their petition herein. For the year 1964 they filed a joint Federal income tax return with the district director of internal revenue at Tacoma, Washington. Hugh E. and Naomi Kennedy, husband and wife, resided in Carmichael, California, at the time they filed their petition herein. For the years 1963 and 1964 they filed joint Federal income tax returns with the district director of internal revenue at San Francisco, *159 California. On October 20, 1954, Hugh E. Kennedy (herein called Kennedy) entered into Articles of Partnership with Harry G. Knox to operate a mortuary business, known as Sierra View Funeral Chapel, located in Carmichael, California. Frances C. Wilcox (herein sometimes called Mrs. Wilcox) was married to Harry G. Knox at the time he entered into the partnership with Kennedy. She remained married to him until his death in May 1956. Prior to her remarriage to George H. Wilcox, she was known as Frances C. Knox. After the death of Harry G. Knox, Mrs. Wilcox succeeded to and became the owner of his partnership interest in the Sierra View Funeral Chapel. After the death of her husband, she invested more than $8,000 in Sierra View Funeral Chapel to buy out a silent partner in the firm. In July 1956, Kennedy and Mrs. Wilcox entered into Articles of Co-Partnership to continue the business known as Sierra View Funeral Chapel as a partnership pursuant to the Articles of Partnership entered into by Kennedy and Harry G. Knox on October 20, 1954, with certain amendments to the earlier agreement. The Sierra View Funeral Chapel was operated by the partnership formed between Kennedy and Harry *160 G. Knox from October 20, 1954, to May 1956. The Sierra View Funeral Chapel was operated by the partnership formed between Kennedy and Harry G. Knox from October 20, 1954, to May 1956. The Sierra View Funeral Chapel was operated by the partnership formed between Kennedy and Frances C. (Knox) Wilcox from July 1956 to February 27, 1963. Facts Relating to the Sale of Mrs. Wilcox's Partnership Interest in Sierra View Funeral Chapel In the latter part of 1962, Kennedy offered to buy Mrs. Wilcox's partnership 697 interest in the Sierra View Funeral Chapel business for approximately $75,000 and made his offer in a written memorandum dated September 6, 1962, which was placed on her desk. Mrs. Wilcox made no direct response to the offer, but informed Kennedy that she did not want to sell her interest. Not long thereafter, Mrs. Wilcox retained Eugene L. Rogers as her attorney to represent her in the matter. Rogers notified Kennedy of his client's intention to employ the arbitration provision contained in the Articles of Co-Partnership. Pursuant to the arbitration provision, Mrs. Wilcox appointed Rogers to act as an arbitrator on her behalf, and Kennedy appointed Albert L. Wagner *161 as his choice for an arbitrator. Arbitration hearings were held on October 30, 1962, and November 9, 1962. At no time did Mrs. Wilcox engage in any direct negotiations with Kennedy or with his attorney, Wagner, concerning Kennedy's efforts to acquire her interest in the business, nor did she engage in any discussions with them as to what sum she would accept for the sale of her partnership interest. Mrs. Wilcox discussed the price acceptable to her for her partnership interest only with Rogers, her attorney. Income and profits from the Sierra View Funeral Chapel business increased steadily over the period during which Mrs. Wilcox was a partner. She believed that the business would continue to be profitable. Rogers, acting on behalf of Mrs. Wilcox, disclosed to Wagner an offer to sell Mrs. Wilcox's partnership interest in the Sierra View Funeral Chapel for $175,000. This offer was rejected by Kennedy's attorney, Wagner. A counteroffer was made to buy Mrs. Wilcox's partnership interest for $90,000. This counteroffer was in turn rejected by Mrs. Wilcox's attorney. On January 2, 1963, Frances C. Wilcox filed a suit in the Superior Court of the State of California, County of Sacramento, *162 No. 141157, entitled "Petition for Dissolution and Accounting of Partnership." In connection with such proceedings, an order to show cause and temporary restraining order were issued asking, among other things, that a receiver be appointed by the Court to take control of the partnership business while the litigation was pending. On February 27, 1963, Kennedy and Mrs. Wilcox executed an Agreement for Dissolution of Partnership, as well as a mortgage of chattels and a deed of trust. Rogers drafted the agreement and it was signed in Wagner's office. Mrs. Wilcox, Rogers, Kennedy and Wagner were all present. At that time Mrs. Wilcox did not intend to enter the mortuary business again. The Agreement for Dissolution of Partnership provided, in pertinent part, as follows: 1. For and in consideration of a transfer, conveyance and assignment(s) by FRANCES C. KNOX, as a partner or otherwise, in and to the total assets of said partnership, including but not limited to any and all interests in real estate, furniture, furnishings, fixtures, tools, implements and vehicles used in connection with said partnership business and in addition thereto, the firm name and any and all accounts receivables, *163 HUGH E. @KENNEDY agrees to pay to FRANCES C. KNOX the sum of ONE HUNDRED TWENTY FIVE THOUSAND DOLLARS ($125,000.00) in the following manner: (a) Twenty nine percent (29%) of said sum, or THIRTY SIX THOUSAND TWO HUNDRED AND FIFTY DOLLARS ($36,250.00) upon execution of this agreement, the balance of said sum to be payable at the rate of ONE THOUSAND TWO HUNDRED AND FIFTY DOLLARS ($1,250.00), or more per month, including interest at FIVE (5) PERCENT on the outstanding balance, with the payments to be credited first to interest and the balance to principal. The first installment payment shall be due one (1) full calendar month after execution of this agreement and monthly thereafter until February 27th, 1968, at which time the entire balance then owing shall be due and payable to FRANCES C. KNOX, or her assignee. HUGH E. KENNEDY agrees to execute a note in favor of FRANCES C. KNOX incorporating the terms set forth herein, said note to be executed concurrently with this agreement. As security for said note HUGH E. KENNEDY agrees to execute, concurrently, a deed of trust wherein FRANCES C. KNOX is named as beneficiary and describing the improved real property as: [Property descriptions *164 omitted.] and as additional security HUGH E. KENNEDY agrees to execute a Deed of Trust, wherein FRANCES C. KNOX is named as Beneficiary, describing the real property as follows: [Property descriptions omitted.] and as to the last described parcel, in the event that same is sold or transferred by HUGH E. KENNEDY prior to the time that the obligation to FRANCES C. KNOX (see 1. above) is fully paid, then the whole net proceeds of the sale of said property shall be applied to reduce the balance of said note then owed to 698 FRANCES C. KNOX. As additional security for the obligation to FRANCES C. KNOX, HUGH E. KENNEDY agrees to execute a chattel mortgage describing certain assets, a copy of which chattel mortgage is attached hereto, marked Exhibit "A" and made a part hereof by reference. FRANCES C. KNOX acknowledges that she has been informed that all or a portion of the described property is subject to a prior lien in favor of Crocker Anglo National Bank. (b) HUGH E. KENNEDY agrees to assume full and individual responsibility for any and all obligations now incurred and outstanding by the said partnership and to hold FRANCES C. KNOX harmless therefrom. (c) HUGH E. KENNEDY agrees *165 to release to FRANCES C. KNOX any and all of his entitlement as beneficiary, holder, owner or in any other capacity, that certain insurance policy wherein FRANCES C. KNOX is the insured, said policy described as: New York Life Insurance Company Policy, #25298790. 2. For and in consideration of the above, FRANCES C. KNOX, agrees that she relinquishes any and all of her interest in that partnership business known as SIERRA VIEW FUNERAL CHAPEL, including, but not limited to, any claim or interest in and to any real estate, furniture, furnishings, fixtures, tools, implements and vehicles used in connection with said business and including accounts receivables, credits, cash on hand and accumulated profits. (a) FRANCES C. KNOX agrees to release to HUGH E. KENNEDY any and all of her interest as beneficiary, holder, owner or in any other capacity as to that certain insurance policy wherein HUGH E. KENNEDY is named as the insured, said policy described as: New York Life Insurance Company Policy #25 340 189. (b) FRANCES C. KNOX agrees that she will not engage as principal, owner, stockholder or partner in any funeral chapel or mortuary business in the County of Sacramento for a period *166 of time equal to Ten (10) years from the date of execution of this agreement. (c) FRANCES C. KNOX agrees that upon execution of this agreement that she will deliver and relinquish to HUGH E. KENNEDY any and all assets of the partnership which she may now be holding, including, but not limited to, any and all funds which may have been paid to her as a result of an obligation to SIERRA VIEW FUNERAL CHAPEL and also including any items of furniture and/or furnishings now located at the address of the funeral chapel and/or the apartment formerly occupied by FRANCES C. KNOX adjacent to the funeral chapel, and that she will have removed from her personal automobile and deliver to HUGH E. KENNEDY, at his expense, the electronic garage door opening device giving access to the premises occupied by SIERRA VIEW FUNERAL CHAPEL; further that she will deliver to HUGH E. KENNEDY, upon execution of this agreement, all keys for access to the business property or the apartment adjacent thereto. (d) FRANCES C. KNOX represents that she has not incurred any obligations to the partnership that are not now reflected on the books of the partnership or the partnership records; further, that she will not *167 at any time in the future, incur any obligations in the name of the partnership or the partnership business. 3. The parties hereto specifically and individually agree as follows: (a) That time is of the essence so far as all of the provisions of this agreement are concerned. (b) In the event of a default by HUGH E. KENNEDY under the note executed in favor of FRANCES C. KNOX, or as to any installment thereunder, a copy of which note is attached hereto, marked Exhibit "B" and incorporated herein by reference, then on the Eleventh (11th) day after the payment or installment became due, unless same shall have been reinstated in the intervening time, FRANCES C. KNOX shall be entitled, permitted and allowed to take full, absolute and sole control and management of the business, retaining all of the profits therefrom and in the event of said reentry, FRANCES C. KNOX shall be deemed to be the sole owner of said business and any interest of HUGH E. KENNEDY be deemed forfeited. (c) Should any obligation to any lendor secured by a deed of trust, or otherwise, on either of the parcels of property described under 1. (a) of this agreement be in default to the extent that the trustee under *168 the deed of trust or the holder of any beneficial interest shall file a notice of default and intent to sell, or in any other means commence proceedings to foreclose upon the security interest, this shall constitute a default as to the obligation to FRANCES C. KNOX and upon either such event, FRANCES C. KNOX shall be entitled, permitted and allowed to take full, absolute and sole control and management of that business now known as SIERRA VIEW FUNERAL 699 CHAPEL, and in the event of such default, FRANCES C. KNOX shall thenceforth be deemed to be the sole owner of said business and any interest therein of HUGH E. KENNEDY shall be deemed forfeited. (d) Each of the parties to this agreement does hereby agree that the consideration(s) set forth in said agreement represent full and complete satisfaction for any and all claims of every kind and nature that now exist as between the parties. (e) HUGH E. KENNEDY and FRANCES C. KNOX do hereby agree to promptly execute any and all documents necessary to completion and transfer and/or sale and purchase of the partnership interest. The Agreement for Dissolution of Partnership is silent with respect to the allocation of any portion of *169 the purchase price to the covenant not to compete. Mrs. Wilcox never discussed the Agreement for Dissolution of Partnership with either Kennedy or with his attorney, Wagner, and all her knowledge of said agreement was obtained from her attorney, Rogers. Mrs. Wilcox never discussed the covenant not to compete contained in the Agreement for Dissolution of Partnership with Kennedy or with his attorney. Mrs. Wilcox never had any discussions with either Kennedy or his attorney concerning what consideration, if any, should be assigned to the covenant not to compete. Mrs. Wilcox was not aware that a covenant not to compete was included in the Agreement for Dissolution of Partnership until after the agreement was made. Rogers held conferences and discussions with Wagner, but not with Kennedy directly, concerning the purchase of Mrs. Wilcox's partnership interest. In the month of January 1963, and sometime prior to January 24, Kennedy's offer to pay $125,000 for Mrs. Wilcox's partnership interest was conveyed to Rogers. Prior to and until Kennedy's offer to pay $125,000 was disclosed, there had been no discussions with Rogers of any covenant not to compete. On or before January 11, 1963, Kennedy *170 and Mrs. Wilcox, through their respective attorneys, were in agreement that Kennedy would acquire Mrs. Wilcox's partnership interest for $125,000 and were in substantial agreement on other provisions. At that time there was not yet any indication or discussion of a covenant not to compete. Rogers outlined the provisions of the proposed sale of Mrs. Wilcox's partnership interest to Kennedy for $125,000 in a letter dated January 11, 1963, addressed to Wagner. The letter did not mention any covenant not to compete. There was no discussion with Rogers of the covenant not to compete during any of the initial negotiations or up to the time that the purchase price was determined. After Rogers had prepared a rough draft of the agreement for the sale of Mrs. Wilcox's partnership interest, he received a telephone call from Wagner, who indicated that Kennedy requested that a covenant not to compete be inserted in the agreement. However, at no time prior to the execution of the Agreement for Dissolution of Partnership were there any discussions with Rogers concerning the placing of any value upon the covenant not to compete, nor was any request ever made by Wagner or Kennedy that a value *171 be assigned to the covenant not to compete. The first discussion of allocating a portion of the purchase price to the covenant not to compete occurred in a telephone call from Wagner to Rogers during March 1963, and approximately 30 days after the execution of the Agreement for Dissolution of Partnership. In the discussion, Wagner inquired whether Mrs. Wilcox would be willing to allocate a portion of the consideration to the covenant not to compete. Late in 1963, Clayton Smith, an accountant acting on behalf of Kennedy, requested that the parties allocate a portion of the price to the covenant not to compete. In August 1963, Oliver Q. Faust, a public accountant representing Kennedy, requested that Mrs. Wilcox allocate $60,000 to the covenant not to compete. Hugh E. and Naomi Kennedy claimed a $5,000 deduction on their 1963 Federal income tax return (schedule of operating expenses) as follows: Amortization of covenant not to compete ($60,000 for 10 years 10 months)… $5,000.00 Hugh E. and Naomi Kennedy claimed a $5,000 deduction on their 1964 Federal income tax return (schedule of depreciation) as follows: Amortization of covenant not to compete, depreciable basis $60,000, *172 straight line method, 10 year life… $5,000.00 700 George H. and Frances C. Wilcox reported the entire $125,000 as the sales price for Mrs. Wilcox's partnership interest on their 1963 Federal income tax return and made no allocation of any value to the covenant not to compete. Facts Rclating to the Prior Employment History of Frances C. Wilcox From 1917 to 1927 Mrs. Wilcox was employed in the office of a fruit house. She was unemployed from 1927 to 1944. She worked during part of 1944. She was unemployed again until late 1954. From the latter part of 1954 until May 1956, she owned an interest in a retail clothing store located in Carmichael, California, and worked as a sales person in the business a few hours each day. She sold her interest in the clothing store when her husband, Harry G. Knox, died. From July 1956 to February 27, 1963, Mrs. Wilcox owned a one-half partnership interest in the Sierra View Funeral Chapel and worked during this period at the funeral chapel as a receptionist. She participated only slightly in the management of the mortuary business. She did not handle any hiring or firing of personnel. Prior to the time when problems arose between her and *173 Kennedy, Mrs. Wilcox was earning $900 per month from the partnership, of which $450 per month represented salary. Except for her interest and employmmnt in the Sierra View Funeral Chpel, Mrs. Wilcox never engaged in any other funeral business. She has never engaged in any profession collateral to the funeral business. Mrs. Wilcox has not engaged in any business or profession since she sold her partnership interest. She was 63 years of age in 1963 when the Agreement for Dissolution of Partnership was signed. Facts Relating to the Prior Employment History of Hugh E. Kennedy Kennedy has been in the funeral parlor business for many years, having started as an apprentice in Minnesota in 1939. After military service in World War II, he became the manager of the largest mortuary firm in Sacramento and worked in that capacity for 8 years. In 1953, Kennedy went into business for himself and since that time has been continually engaged in his own mortuary business or as a partner in such business. During the entire period of time that Mrs. Wilcox was a partner in the Sierra View Funeral Chapel, Kennedy managed the funeral chapel and made all the business decisions with respect to *174 the partnership. He hired and fired employees, handled the purchasing of merchandise and about 65 percent of the sales, conducted the funerals and handled public relations. Kennedy was a licensed embalmer and sometimes performed embalming services at the Sierra View Funeral Chapel. The Sierra View Funeral Chapel was licensed as a result of Kennedy's personal efforts. Ultimate Findings No part of the $125,000 consideration agreed to be paid by Kennedy to Mrs. Wilcox for her partnership interest in Sierra View Funeral Chapel, pursuant to the agreement dated February 27, 1963, constituted consideration for the covenant not to compete. Mrs. Wilcox and Kennedy did not intend, at the time they executed the agreement, to allocate any part of the $125,000 purchase price to the covenant not to compete. Opinion In his reply brief, counsel for Kennedy criticizes respondent for shifting from a position of neutrality at trial to one favoring petitioner Frances C. Wilcox after trial. We are not alarmed by the respondent's approach, especially in view of the evidence adduced at the trial. Originally, respondent took inconsistent positions in the notices of deficiencies sent to the respective *175 petitioners so that the revenue would be adequately protected. It is understandable that he did not want to be whipsawed by the respective petitioners since the buyer and the seller are in opposite positions for Federal income tax purposes. Respondent's counsel frankly stated at the trial that the respondent is seeking consistent tax treatment in accordance with all the facts and circumstances surrounding the transaction between Mrs. Wilcox and Kennedy. Consistent with his stated position, respondent argues in his brief that The indisputable facts clearly support a finding that no allocation of any value to the covenant not to compete was intended by the parties. No value was allocated to the covenant in the Agreement for Dissolution of Partnership. The parties agreed upon the $125,000 purchase price for the partnership interest prior to any mention of a restrictive covenant. The 701 covenant was merely inserted in the agreement upon the buyer's request and without any bargaining or opposition by the seller. The parties had no discussions as to the allocation of a value to the covenant. In addition, the covenant had no value, as is indicated by Mrs. Wilcox's lack of intent to *176 compete and her inability to compete. Moreover, the Kennedy's concept of the burden of proof under these circumstances is garbled. Neither the consolidation of the two cases for trial nor respondent's request for consistent tax treatment of the respective petitioners has any effect on burden of proof. In each case the burden of proof remains upon the respective petitioners to show to the satisfaction of this Court that the respondent's determination is erroneous. As our ultimate findings of fact indicate, the facts established by this record convince us that the Wilcoxes have met their burden and the Kennedys have failed to meet theirs. The issue here is entirely factual. The applicable rule of law in cases where there is no allocation to a covenant not to compete in the agreement of sale is plainly stated in (C.A. 9, 1962): Did the parties, not preliminarily, but when they signed this agreement, intend to allocate a portion of the purchase price to the covenant not to compete? * * * The parties are entitled to a clear cut decision as to what their intent was, as evidenced by the agreement and all the surrounding *177 circumstances. While no particular fact is conclusive, there are several factors present which tend to support our view that no consideration was paid, or intended to be paid, for the covenant not to compete. First, the agreement contained no allocation of the purchase price to the noncompete covenant. It has held that the failure of the parties to allocate in an agreement any part of the consideration to a noncompete covenant is "strong evidence" that no allocation was intended. Delsea Drive-In (C.A. 3, 1967), affirming per curiam a Memorandum Opinion of this Court. (C.A. 5, 1966), affirming per curiam a Memorandum Opinion of this Court. Similarly, the Court of Appeals for the Ninth Circuit treats the absence of an allocation of consideration to a covenant not to compete as "pretty good evidence" that no allocation was intended. . Thus, in the absence of strong proof to the contrary, and there is no such proof in this record, we think the parties, at the time they executed the Agreement for *178 Dissolution of Partnership, did not intend to allocate any part of the purchase price to the covenant. Second, the parties through their attorneys, preliminarily agreed to the total purchase price of $125,000 before there was any discussion about including a restrictive covenant clause in the agreement. See , where the Court of Appeals said (p. 7): There was substantial evidence tending to show that no such allocation was intended. The desirability of a restrictive covenant was not discussed until the purchase price of $115,000 was settled by preliminary agreement. There was never any discussion of an allocation of part of that price as consideration for the covenant. See also Delsea Drive-In , where this Court stressed the fact that the parties had fixed a price for the stock before there was any discussion about a covenant not to compete. The record here clearly shows that Mrs. Wilcox and Kennedy, through their counsel, reached agreement on the purchase price for Mrs. Wilcox's partnership interest prior to any discussions between Rogers and Wagner about a covenant not to *179 compete. It was not until after Kennedy had offered $125,000 for Mrs. Wilcox's partnership interest and her attorney, Rogers, had prepared a draft of the agreement, incorporating therein the purchase price, that Wagner informed Rogers by telephone that Kennedy wanted a noncompete covenant in the agreement. Third, there was never any discussion as to the allocation of part of the purchase price to the covenant not to compete. ; and Delsea drive-In We are satisfied that there was no meeting of the minds with respect to an allocation of part of the purchase price to the covenant. In view of the apparent hostility that existed between Mrs. Wilcox and Kennedy and their competing tax interests, there was created an antithetical atmosphere which no doubt compelled them, on advice of counsel, to agree 702 upon terms and conditions that reflected their true intent. Cf. (C.A. 2, 1959), affirming, . Where, as here, the parties were represented by competent counsel who comprehended the substance of the *180 transaction, they are bound by the tax consequences flowing therefrom. (C.A.9, 1963). Moreover, Kennedy was obviously afraid that, if the purchase of Mrs. Wilcox's partnership interest was not consummated immediately, the Sierra View Funeral Chapel business might have been put in the hands of a receiver. The inference readily drawn from the actions of Kennedy and Wagner is that they were both aware that if they insisted upon assigning a value to the covenant not to compete in the agreement, and thus alter its tax consequences, Mrs. Wilcox would not have agreed to any allocation, the sale would have fallen through, and the partnership would have ended up in receivership. Hence, Kennedy and Wagner, by their silence, acquiesced in the obvious tax implications of the February 27, 1963, agreement, thus adopting, as their own, Rogers' intent to allocate no value to the covenant when he drafted the agreement. In other words, the parties got exactly what they bargained for, including the contemplated tax results. Therefore, under these circumstances, we are unwilling to rewrite the clear and unequivocal terms of the agreement which we think *181 accurately reflects the intent of the contracting parties at the time of its execution. Kennedy's unilateral allocation of $60,000 to the covenant must be rejected. Finally, when the agreement was signed, Mrs. Wilcox did not intend to re-enter the mortuary business and compete with Kennedy. In fact, she was then 63 years of age and lacked the requisite knowledge, experience and contacts to compete with Sierra View Funeral Chapel, a business with established public relations in the community and with an experienced owner and manager. Consequently, the covenant not to compete had little, if any, "relationship with business reality." Cf. ; (C.A. 5, 1966), affirming a Memorandum Opinion of this Court. As we see it, the real significance Kennedy attributed to the noncompete covenant was to permit him at a later time to make a unilateral allocation of $60,000 of the purchase price to the covenant so that he could claim amortization deductions for Federal tax purposes. Kennedy's reliance upon (C.A. 7, 1955), *182 is misplaced. Noncompetition was the important element of the transaction in that case, while here the covenant not to compete was merely Kennedy's afterthought motivated by tax considerations and inserted into the agreement after the essential elements were discussed and agreed upon. Petitioner Kennedy attempted to show that the true value of Mrs. Wilcox's partnership interest was only $70,000. We think there is no credible evidence to support this contention. No current, reliable appraisal of partnership assets on or about February 27, 1963, was offered in evidence. Accordingly, Decision will be entered for the petitioners in Docket No. 3736-66. Decision will be entered under Rule 50 in Docket No. 4817-66.